**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lula Stago,<br><br>        Plaintiff,<br><br>v.<br><br>Office of Navajo and Hopi Indian Relocation,<br><br>        Defendant. | No. CV-25-08020-PCT-JAT<br><br>**ORDER** |

Pending before the Court are Plaintiff Lula Stago's Motion for Summary Judgment (Doc. 19) and Defendant Office of Navajo and Hopi Indian Relocation's ("ONHIR") Cross-Motion for Summary Judgment (Doc. 21). Both Motions have been fully briefed. (Doc. 25; Doc. 28). For the following reasons, Plaintiff's Motion will be granted, Defendant's Motion will be denied, and the matter will be remanded for further proceedings.[1]

**I.   BACKGROUND**

Plaintiff seeks judicial review of an administrative decision by ONHIR denying her relocation benefits under the Navajo-Hopi Settlement Act. Pub. L. No. 93-531, 88 Stat. 1712 (1974) (the "Settlement Act").

**A.  The Settlement Act**

The Settlement Act divided land that was jointly used by the Navajo Nation and

---

[1] Plaintiff requested oral argument. However, the Court finds that oral argument would not assist in the resolution of the present issues and therefore will rule on the pending motions without oral argument. LRCiv. 7.2(f); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Hopi Tribe into two areas: (1) the Hopi Partitioned Lands ("HPL"); and (2) the Navajo Partitioned Lands ("NPL"). *Clinton v. Babbitt*, 180 F.3d 1081, 1084 (9th Cir. 1999). The Settlement Act also created a federal agency—now known as ONHIR—to provide services and benefits to relocate individuals who resided on land allocated to the other tribe. *Bedoni v. Navajo-Hopi Indian Relocation Comm'n*, 878 F.2d 1119, 1121–22 (9th Cir. 1989). To be eligible for relocation benefits under the Settlement Act, a Navajo applicant must prove that: (1) he was a legal resident of the HPL on December 22, 1974, and (2) he continued to be a resident of the HPL when he became a "head of household." *See* 25 C.F.R. § 700.147(a), §§ 700.69(a)(2), (c); *see also Begay v. Off. of Navajo and Hopi Indian Relocation*, No. CV-20-08102-PCT-SMB, 2021 WL 4247919, at *1 (D. Ariz. Sept. 17, 2021), *aff'd*, No. 21-16937, 2022 WL 17038707 (9th Cir. Nov. 17, 2022). The applicant bears the burden of proving legal residence and head of household status. 25 C.F.R. § 700.147(b).

### B. Facts and Procedural History

Plaintiff is an enrolled member of the Navajo Nation and applied for relocation benefits on July 6, 2009, and again on August 12, 2009. (Doc. 14-1 at 32, 43; Doc. 21 at 32). ONHIR informed Plaintiff that her application had been denied on November 19, 2010. (Doc. 14-1 at 73). ONHIR concluded that Plaintiff failed to meet the eligibility requirement of having resided on the HPL on or before December 22, 1973 and as of December 22, 1974 because: (1) she was not enumerated on the HPL, (2) she only had a cornfield and some grazing land but no structures on the HPL during that time, (3) the camp where her family resided was on the Hopi Reservation, not the HPL, and (4) her family's move-off date was in the fall of 1974, before December 22, 1974. (Doc. 14-1 at 74). Plaintiff appealed (*Id.* at 79), and on December 20, 2013, a consolidated hearing was held before an Independent Hearing Officer ("IHO") for Plaintiff and six other applicants related to Plaintiff that claimed the same HPL homesite as Plaintiff. (Doc. 14-4 at 23; Doc. 14-11 at 293). The other applicants were Mary Rose Charley (Plaintiff's aunt), Frieda Thompson (Plaintiff's sister), Rose Calvin (Plaintiff's cousin), Susie Yellowman

(Plaintiff's cousin), James John (Plaintiff's cousin), and David John (Plaintiff's cousin). (Doc. 14-11 at 279, 346; *see* Doc. 20 at 10, 13).

At the December 20, 2013 hearing, the parties stipulated that Plaintiff met the requirements to establish she was a head of household by December 22, 1974. (Doc. 14-11 at 293; Doc. 14-4 at 24). The primary issue before the IHO was whether Plaintiff's residency on the HPL continued through December 22, 1974. (Doc. 14-11 at 294; Doc. 14-4 at 25; Doc. 21 at 2).

Crucial to several of Plaintiff's arguments in this action are prior ONHIR decisions related to Harris Chezumpena (Plaintiff's mother's first cousin, which she referred to as her grandfather) and his daughters Elvira and Bertha Chezumpena. (Doc. 19 at 6; Doc. 14-3 at 112; *see* Docs. 20, 22 ¶¶ 18, 25; Doc. 14-4 at 54). Plaintiff and the other applicants claim to have occupied the same customary use area on the HPL as Harris Chezumpena through the mid-1970s. (Doc. 19 at 3, 6). Harris was certified by ONHIR for relocation benefits. (Docs. 20, 22 ¶ 35). In decisions related to Elvira's and Bertha's applications for benefits, the IHO found that the family moved from the HPL to the NPL in 1976 and were legal residents of the HPL on December 22, 1974. (Doc. 14-6 at 3, 15). Elvira and Bertha were denied benefits for other reasons. (Docs. 20, 22 ¶¶ 23–24, 30–31).

At Plaintiff's hearing, ONHIR agreed "to stipulate that Mr. Harris Chezumpena had a legal residence on the [HPL] as of December 22, 1974" based on Harris Chezumpena's certification for benefits and the IHO's findings in Elvira and Bertha Chezumpena's cases. (Doc. 14-5 at 13–14). However, the parties did not agree on the location of Harris Chezumpena's HPL site, what improvements were located at the site, who else resided at the site, or other such matters relevant to Plaintiff's appeal. (*Id.* at 13; Doc. 14-6 at 61–62; Doc. 22 at 33 ¶ 11; Doc. 26 at 2 ¶ 11). In ONHIR's post-hearing brief, ONHIR stated that ONHIR "agrees that Harris Chezumpena lived on the HPL until 1976" and that he raised Rose Calvin, Susie Yellowman, James John, and David John. (Doc. 14-9 at 56; Doc. 14-6 at 62). ONHIR suggested that the question for the IHO is whether on December 22, 1974, the applicants "were **still** legal residents of the HPL or whether they had established legal

residences outside the HPL prior to that date." (Doc. 14-9 at 56).

At the hearing, Plaintiff and the other six applicants testified on behalf of Plaintiff. (Doc. 14-4 at 29–114; Doc. 14-5 at 13–80). Joseph Shelton testified for ONHIR. (Doc. 14-4 at 114–15; Doc. 14-5 at 1–13). The applicants testified that the family's customary use area was large and shared by the entire extended family, encompassing site 6, where Plaintiff, Frieda Thompson, and Mary Rose Charley primarily resided, and sites 2, 3, and 4, where Harris Chezumpena and the other applicants primarily resided. (Doc. 14-4 at 30–33, 35–37, 81, 85–86, 93–94, 96, 104, 110; Doc. 14-5 at 18, 23, 28, 31, 43–45, 48, 54, 58, 63–64, 72).

Plaintiff testified that she and her family occupied the HPL site from 1947 until January 1975. (Doc. 14-4 at 33, 54). She testified that her family started to move their livestock to the NPL after her family's grazing permits were cancelled in 1972, but that the family did not move to the NPL until January 1975 and continued to return to site 6 in the summers to farm through January 1975. (*Id.* at 37–40). Frieda Thompson testified that her family started moving in January 1975 and herded their sheep off the HPL in January 1976. (*Id.* at 98, 104). Susie Yellowman testified that the family left the HPL site in 1976. (Doc. 14-5 at 50). John James also testified that the family left the HPL site in 1976 or 1977 and sold the family's livestock in 1975 or 1976. (*Id.* at 64–66).

On March 21, 2014, the IHO issued his first decision denying the applicants' appeals and affirming ONHIR's denial of relocation benefits. (Doc. 14-7 at 50). The IHO concluded that "none of the applicants was a legal resident of any area partitioned for the use of the Hopi Indians, as, prior to the date of passage of the [Settlement] Act, Harris Chezumpena . . . had abandoned their residence and cornfield in the [HPL] area . . . ." (Doc. 14-7 at 56). The IHO explained that the objective and circumstantial evidence suggested that Harris Chezumpena and the entire family completely abandoned the HPL area and moved with their livestock three miles south to the NPL when their grazing permits were cancelled in 1972. (*Id.* at 57–64). The IHO determined that the applicants' testimonies that they resided in, used, or visited areas of the HPL on or after December 22,

1974 were not credible in light of the evidence that Harris Chezumpena abandoned the HPL homesite prior to that date. (*Id.* at 56, 65). The IHO also found Harris Chezumpena's Declaration in support of Mary Rose Charley's application not credible. (*Id.* at 67; *see* Doc. 14-2 at 84–85). ONHIR adopted the IHO's decision as final on March 21, 2014. (Doc. 14-7 at 74).

On May 21, 2020, Plaintiff, Mary Rose Charley, and Frieda Thompson appealed to this Court. (Doc. 14-9 at 129). Another Judge in this District granted Plaintiff's motion for summary judgment and remanded the case to ONHIR. *See Stago v. Off. of Navajo and Hopi Indian Relocation*, 562 F. Supp. 3d 95, 100 (D. Ariz. 2021); *see also Calvin v. Off. of Navajo and Hopi Indian Relocation*, No. CV-20-08117-PCT-DWL, 2021 WL 6197900 (D. Ariz. Dec. 29, 2021) (appeal regarding the other applicants at the consolidated hearing). The Court found that "the IHO's decision [was] explicitly contrary to the parties' narrow stipulation regarding Harris Chezumpena's residency." *Stago,* 562 F. Supp. 3d at 104. The Court was unable to determine whether the IHO's credibility findings and other conclusions were supported by substantial evidence because the Court could not "determine the extent to which the IHO relied on findings contrary to the stipulation." *Id.* at 104–05. The Court noted that the stipulation had "no conclusive effect on Plaintiffs' legal residency," and therefore remanded for further proceedings giving due consideration to the stipulation. *Id.* at 106. To guide the proceedings on remand, the Judge also noted that: (1) the IHO is not bound by factual findings made in prior cases upon different records and is free to make findings supported by the evidence presented in this case, and (2) regarding Plaintiff's trustee responsibility argument, the ONHIR's duty to disburse benefits to eligible applicants does not dictate Plaintiff's eligibility. *Id.* at 103, 105–06.

On remand, the IHO asked the parties to submit memoranda addressing each applicant's visitation to the claimed HPL site between November 1975 and February 1975. (Doc. 14-11 at 12, 17). Plaintiff and the other applicants requested a supplemental hearing to present evidence regarding their residency. (Doc. 14-10 at 409; Doc. 14-11 at 294). On April 20, 2022, the IHO denied the applicants' request for a supplemental hearing because

the remand was not predicated on any activity prior to or during the hearing, and the applicants had notice and the opportunity to present such evidence at the December 20, 2013 hearing. (Doc. 14-11 at 13-14).

On July 28, 2022, the IHO issued his second decision, again denying Plaintiff's appeal. (Doc. 14-11 at 361). The IHO concluded that Plaintiff failed to meet her burden of establishing that she was a legal resident of the HPL on December 22, 1974. (*Id.* at 355). In support of this conclusion, the IHO stated that he relied on the BIA enumeration, Plaintiff's knowledge of relocation benefits and decision not to immediately apply, Plaintiff's statements related to the location, purpose, and use of the claimed area, Plaintiff's contradictory statements in her two applications, contradictory testimony between Plaintiff and the other applicants, and Joseph Shelton's report and testimony. (Doc. 14-11 at 355).

In the second decision, the IHO explicitly acknowledged the parties' stipulation that Harris Chezumpena had a legal residence on the HPL until 1976. (Doc. 14-11 at 294, 347, 349). However, the IHO found that Harris Chezumpena was enumerated on NPL in January 1975 and at that time did not identify any improvements the family owned on the HPL. (*Id.* at 347). The IHO further found that the stipulation between the parties regarding Harris Chezumpena "does not establish that [Plaintiff] resided at Mr. Chezumpena's area before December 22, 1973, and as of December 22, 1974," and "does not establish that it was Mr. Chezumpena's only residence as he . . . was enumerated on NPL in January 1975." (*Id.* at 349). The IHO also found that Harris Chezumpena did not include Plaintiff in his application for relocation benefits. (*Id.*).

The IHO concluded that "[t]he parties' stipulation regarding Harris Chezumpena's legal residence on HPL does not establish or even affect [Plaintiff's] eligibility for relocation benefits." (*Id.* at 354, 360). The IHO noted:

> Harris Chezumpena was a titular and putative legal resident as of December 22, 1974, all based on his historic association with the land that became HPL. He was "classified" as a legal resident in order to preserve his right to receive financial assistance under the [Settlement] Act but the reality of the situation and the circumstances as they existed on December

> 22, 1974, were that there was **no** physical residence, **no** improvements, and **no** use of HPL by either Harris Chezumpena or [Plaintiff]. The discovery of Harris Chezumpena at his NPL home by the enumerators less than one month after the [Settlement] Act became law proves as much.

*Id.* at 361.

The IHO also made findings about the witnesses' credibility. The IHO found that the applicants were not credible witnesses because their "[a]pplications, testimony, and supplemental evidence in the record contradict each other and the evidence in multiple ways." (*Id.* at 330). Specifically, the IHO found that the applicants' testimonies were not credible regarding: (1) their awareness of the relocation process and potential eligibility, (2) their use of the claimed HPL sites, (3) physical access to the claimed HPL sites, (4) the extent of the development of the sites, the number of structures on the sites, and the number of people living at the sites, (5) the location of the family's claimed HPL sites, (6) when the family moved from the HPL and the family's use of and access to the HPL site after the grazing permits were cancelled in 1972, and (7) when the hogan on the NPL was built. (*Id.* at 330–36). The IHO also found each applicant's testimony not credible regarding the family's use and residence on the HPL sites on December 22, 1974. (*Id.* at 336–45). The IHO found Joseph Shelton to be a credible witness because of his background, qualifications, and experience. (*Id.* at 346).

ONHIR adopted the IHO's decision as final on September 6, 2022. (Doc. 14-12 at 1). Plaintiff then filed her Complaint on January 29, 2025, seeking judicial review of ONHIR's decision that she is not entitled to relocation benefits under the Settlement Act. (Doc. 1).

## II.     STANDARD OF REVIEW

The Administrative Procedure Act ("APA") governs judicial review of agency decisions under the Settlement Act. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995). Unlike summary judgment in an original district court proceeding, the function of the Court when reviewing an administrative proceeding "is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). The APA provides that a reviewing court may set aside an administrative agency's decision only if that decision was "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Bedoni*, 878 F.2d at 1122 (citing 5 U.S.C. § 706(2)(A), (2)(E) (1982)). "Substantial evidence is more than a mere scintilla, but less than a preponderance," *Orteza v. Shalala*, 50 F.3d 748, 749 (9th Cir. 1995), and requires only "such relevant evidence as a reasonable mind might accept as adequate," *Info. Providers' Coal. for Def. of the First Amend. v. FCC*, 928 F.2d 866, 870 (9th Cir. 1991) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Hopi Tribe*, 46 F.3d at 914 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under this standard, the Court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained [its] decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency decision is arbitrary and capricious only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43. In reaching his conclusions, the IHO "is entitled to draw inferences logically flowing from the evidence." *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984). "Where evidence is susceptible of more than one rational interpretation," the Court must uphold the agency's decision. *Id.*

### III. DISCUSSION

Plaintiff presents several arguments that the IHO's decision was arbitrary, capricious, and not supported by substantial evidence. (Doc. 19 at 2–17). ONHIR argues that Plaintiff failed to meet her burden of establishing that the agency's actions violate the

APA. (Doc. 21 at 9).

### A. Harris Chezumpena Stipulation

Plaintiff argues that the IHO again improperly disregarded the parties' stipulation that Harris Chezumpena was a legal resident of the HPL as of December 22, 1974. (Doc. 19 at 4). ONHIR argues that the IHO gave due consideration to the stipulation, did not make findings contrary to the stipulation, and supported the decision with substantial evidence. (Doc. 30 at 1).

The Court finds that although the IHO acknowledged the parties' stipulation as to Harris Chezumpena's residency in his second decision, the IHO once again arbitrarily disregarded this stipulation by relying on findings contrary to the stipulation. The IHO noted that "[w]hile the parties stipulated that Harris Chezumpena had a legal residence on the HPL as of December 22, 1974, Harris Chezumpena was, in fact, enumerated on the NPL in January 1975." (Doc. 14-11 at 294). The IHO found that "Harris Chezumpena was a titular and putative legal resident as of December 22, 1974," but "the reality of the situation and the circumstances as they existed on December 22, 1974, were that there was **_no_** physical residence, **_no_** improvements, and **_no_** use of the HPL by either Harris Chezumpena or these Applicants." (Doc. 14-11 at 361).

The IHO's finding that Harris Chezumpena *did not* live on the HPL as of December 22, 1974 directly contradicts the parties' stipulation that Harris Chezumpena *did* live on the HPL as of December 22, 1974. Once the IHO accepted the stipulation, he "could not properly review the record and decide the facts contrary to the stipulation which had been accepted and which had shaped the hearing before the [IHO]." *United States v. Smith*, 86 F.3d 1165, 4 (9th Cir. 1996); *Stago*, 562 F. Supp. 3d at 104.

In the prior appeal to this Court, the District Judge noted that "the Court cannot determine the extent to which the IHO relied on findings contrary to the stipulation" and therefore "reache[d] no conclusions as to whether the evidence was otherwise sufficient to support the IHO's decision." *Stago*, 562 F. Supp. 3d at 104–05. That Judge concluded that remand was appropriate because the stipulation "has no conclusive effect" on Plaintiff's

legal residency. *Stago*, 562 F. Supp. 3d at 106. The IHO took this to mean that the stipulation "does not establish or even affect" the applicants' eligibility for relocation benefits. (Doc. 14-11 at 354). However, the Court finds this conclusion to be arbitrary and unsupported by substantial evidence. The District Judge in the prior appeal found that the stipulation's effect was not conclusive—not that the stipulation had no effect.

Moreover, the IHO did not make findings necessary to determine the scope and effect of the stipulation. Without clear findings related to the stipulation, the Court once again cannot determine the extent to which the IHO relied on findings contrary to the stipulation and therefore cannot determine whether the evidence was otherwise sufficient to support the IHO's decision. For example, the IHO treated the BIA enumeration as "prima facie evidence of residency which each Applicant must rebut." (Doc. 14-11 at 354) (citing *Begay v. Off. of Navajo and Hopi Indian Relocation*, 305 F. Supp. 3d 1040, 1049 (D. Ariz. 2018)). The IHO concluded that Plaintiff "failed to present evidence that disproves the evidence in support of the BIA enumeration findings." (Doc. 14-11 at 355). However, if the IHO finds that Harris Chezumpena's HPL site was the same area claimed by Plaintiff and the other applicants, the stipulation that Harris Chezumpena was a legal resident on December 22, 1974 would be evidence rebutting the BIA enumeration. Such a finding would also undermine the reliability of the BIA enumerations because Harris Chezumpena was not enumerated on the HPL despite the stipulated fact that he lived on the HPL during the relevant time period.

Additionally, it is unclear the extent to which the IHO's credibility determinations relied on findings contrary to the stipulation. For example, in determining that the applicants' testimony regarding their use of the claimed HPL sites was not credible, the IHO stated that "it does not logically flow that the BIA enumerators entirely missed the Applicants' family members because they were using one camp or another," and concluded that "the family members would have been located and enumerated if they, in fact, had been present." (Doc. 14-11 at 331–32). Further, the IHO rejected the applicants' testimony regarding the structures on the HPL site built by Harris Chezumpena, reasoning that "the

maps of the area from 1974 and 1975 show no improvements in such area," and that "[t]he BIA was unlikely to completely overlook this large, developed site in the 1974-1975 Enumeration and aerial photography around the same time." (*Id.* at 332–33). If the IHO finds that Harris Chezumpena's HPL site was the same area claimed by Plaintiff and the other applicants, such a finding would undermine the IHO's use of the BIA enumerations, maps, and aerial photography to discredit Plaintiff's testimony because reliance on that evidence would be contradictory to the stipulation that Harris Chezumpena did in fact reside on the HPL at that time.

Accordingly, the Court will remand for further proceedings giving due consideration to the stipulation. On remand, the IHO should make specific findings necessary to determine the scope and effect of the Harris Chezumpena stipulation. The IHO should consider facts left open by the stipulation, such as the location of Harris Chezumpena's HPL site, what improvements were located at the site, who else resided at the site, and any other findings relevant to determining the effect of the stipulation on Plaintiff's eligibility for relocation benefits.

## IV.     CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 19) is **granted**. The matter is **remanded** for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. 21) is **denied**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and **terminate this action**.

Dated this 23rd day of February, 2026.

James A. Teilborg
Senior United States District Judge